Good morning. May it please the court. Mr. Perez raises several arguments challenging both his conviction and sentence. Today I plan to do things a bit backwards and start with the drug overbreath argument and then discuss the suppression motion with remaining time. But I'm happy to answer questions about any of the arguments in the brief. First, Mr. Perez's Iowa cocaine convictions are not serious drug offenses under the Armed Career Criminal Act, and they are also not controlled substance offenses under the guidelines. His cocaine convictions included the substance Ioflupane, and at the time of federal sentencing, both Iowa and the federal government had no longer controlled Ioflupane. For both ACCA and the guidelines, this court must look to what substances are controlled at the time of a defendant's federal sentencing. And I think as far as ACCA, I might have made it more difficult for myself than I needed to, because the definition of a serious drug offense differs from the guidelines in that it directly incorporates the CSA to its definition. In this court, both Oliver and Ford, while it wasn't argued then by the government when conducting the categorical analysis as to drug overbreath for a sentencing enhancement that directly incorporated the CSA, the court used present tense language. The court also referred to the current drug schedules. So I know that there was a dispute about whether this is de novo or whether this is plain error. Our position is that reversal is required, even if it's plain error, especially for the ACCA challenge, as this court has applied the current drug schedules previously in both Oliver and Ford. As to the guidelines... Counsel, I'm not an expert on this like Judge Kelly, so I've got to ask a very simple-minded question. As I understand this case, at the time of the conviction, the federal and state matched, and at the time of the sentencing, federal and state matched, right? Correct. Well, it seems to me that makes it different than all these other cases, but tell me how I'm wrong. It's not, Your Honor, because while McNeil says we look at what a defendant was convicted of for their prior conviction as it was defined at that time, so we look at the prior definition just for determining what a defendant's actual conviction was. But when we determine what the definition of either controlled substance offense or serious drug offense may be, we have to look at it in present day, because that is when the enhancement or whatever repercussions of that prior conviction is being applied. And that's what all of the circuits who have addressed this argument have found, that McNeil doesn't stand for the proposition that when we're implying an enhancement today, we need to do a look back and define whatever federal sentencing enhancement it is as it was at the time of the prior state conviction. We look to as it is defined at the time that a defendant is being sentenced on this federal case. And even as to whether it's plain error review, even under plain error review, Bautista reversed, because this argument is based on fundamental sentencing principles. As far as the guidelines, as I've already stated, they incorporate the definition of CSA or excuse me, ACCA. But as far as the guidelines, there's a fundamental rule that we applied the guidelines that are in effect at the time of a defendant's sentencing. This includes any incorporation or outside reference to outside statutes. Ms. Quick, what do we do with Henderson? Does that not stand in your way of your at least your guideline argument? It seems like our court has gone in a little bit different direction than some of the other circuits as to whether we incorporate the CSA in the fashion that you've described. So I don't think so, Your Honor. In this case, Henderson said we look to state law. Henderson doesn't say and it can't say that we toss out the categorical approach entirely. All that Henderson is saying is we don't reference whether something is controlled as a controlled substance offense under the guidelines by looking to the CSA. We look to state law. Now, this court still has to analyze, OK, what is controlled under state law? So when we look to Iowa at the time of Mr. Perez's federal conviction, Iowa no longer controlled Iofepain. So in other cases, that might make a difference. And Henderson would control. But it does not for Mr. Perez's case, whether whether this court has does the CSA or Iowa state law, it's overbroad today. So if I understand what you're saying is that you in both analyses for ACCA and the guidelines, you have to look back in time to see actually what the conviction was for. But even in the guidelines, you're saying you have to then apply present day definitions. And that's when you go to. Are you saying through the guidelines, you go then to the current state law definition? That is correct, Your Honor. If under Henderson, this court said state law and Henderson didn't say that. You know, if it's a substance that was at one point controlled, it counts as a controlled substance because that would be completely undoing the categorical approach. And this court can't do that. There still has to be a definition that a court can compare a prior conviction to and determine if it's overbroad or not. And Henderson, all they said, all the court said was we look to state law. And that's all that in Mr. Perez's case, I'm asking this court to do is to look to present state law to determine if it is overbroad or not. So I don't think that Henderson really it doesn't make a difference necessarily in Mr. Perez's case, but it would impact this argument. Another when dealing with other substances. And it is overbroad just based on the plain language of the statute. Both whether looking at ACCA for the CSA or state law, both have clearly both jurisdictions have clearly removed Iofu Payne based off of looking at that statute. And that amendment is overbroad under Gonzalez versus Wilkinson. There's no need to go to the realistic probability approach under that Gonzalez when the statute itself is clearly overbroad. If there are no other questions on the. On the sentencing issues, I'd like to discuss the Fourth Amendment challenge again. Pardon my ignorance, but you said no other circuit had ruled the other way. What about Doe versus Session, which is a published case and the Balasage case? I know we're different than Ninth Circuit. We regularly say that. So, but help me on those two cases. So the government, those are immigration cases. And in the other circuits, the government has tried to rely on these immigration cases and courts when applying them in this criminal context has generally shut that down. And that's because the immigration context when dealing with the repercussions of a prior conviction, it's immediately apparent. It's immediately necessary to determine if that conviction would be render someone removable, deportable. That's why we as defense attorneys are constitutionally obligated to inform defendants of the repercussions of that conviction. But that doesn't apply in this criminal context. There is no immediate. There is no immediate concern of application of that prior conviction as to a sentencing enhancement like it would be in the immigration context. There has to be an intervening circumstance. So it depends on what. So it depends on what defense counsel tells the client. No, your defense counsel advises the client. If they change the drug laws, these may not count against you for ACA purposes. No, your honor. It does not depend on what a defendant is advised to that. I thought that's what your distinction was on the immigration cases. Tell me if I don't understand what you just argued. It just illustrates that why immigration cases are not are not helpful on the issue that this court has to decide today. Don't they use a categorical approach, too? They do, your honor. But in in the immigration context, it's necessary to look at how it's defined at the time that a defendant has that conviction because the repercussions happen immediately. So it at that moment, as a defendant is convicted, you know, there's concerns of removal. There's concerns of deportation. That doesn't happen with ACA and the controlled substance offenses there. Some kind of intervening event. Another federal conviction needs to happen before that analysis becomes relevant. And also, it's it would defeat the intent of Congress to say, well, let's look at what controlled substances were in effect at the time of the prior conviction. Because in Congress, either Congress or a state legislature, by removing a substance from that definition of controlled substance offense, they are saying we no longer see this as harmful, no longer needing to be controlled, whatever it may be. It then does not make sense to, especially under the Armed Career Criminal Act, have such a drastic increase to a defendant's sentence when the legislature has said this does not even need to be controlled today in present day. There are no other immediate questions. I just want to briefly talk about the suppression issue. His rights were violated when Fourth Amendment rights were violated when law enforcement took a drug sniffing dog within inches of his apartment door. And before getting to the meat of this, I think it's necessary to clarify what this case is not about. This is not just about common hallways or common spaces in general. This argument is much more narrow. This argument is about whether cartilage is the six inches that right in front of an individual's apartment door that is contained within a common hallway. Or whether an individual has a reasonable expectation of privacy from the use of a drug sniffing dog within the few inches of his or her apartment door. Under the facts of this case, looking to the done factors, this was cartilage. Like I said, they were within inches. Burstyn and Hopkins are consistent with the idea, they obviously did not directly address this, but consistent with the idea that this is cartilage. And this wasn't just like an open hallway necessarily. Each of the residents, looking at the pictures, there was a bit of a recess that provided some privacy and kind of separated the doors from the other residences in the hallway. Ms. Quick, are you asserting sort of a, I understand we've got the specific facts of this case that you've presented a few inches outside of this door. Is this going to be a very fact-specific analysis for each apartment building based on your argument? Or is there just by nature in your position some area around anyone's entry into their home that is sort of what Justice Scalia recognized as sort of, well, that's obviously cartilage. What's your position on that? I think both. I think my initial position would be when you're within inches of an individual's residence, that would be cartilage. But I think if the court is hesitant to make such a broad ruling, it can do so based off of the specific factors in this case. Because like in Burstyn and Hopkins, the court there analyzed that apartment and those townhomes specifically, noting how they were used and that there were personal effects outside. So either way the court looks at it, it would be cartilage. Would you address the applicability of a good faith exception in that a warrant was acquired before the search was conducted? So the court, our initial position is that a later search warrant cannot sanitize the constitutional violation that occurred before obtaining a search warrant. That good faith cannot, if there was an earlier constitutional violation that was relied upon to obtain the search warrant, that good faith should not apply. Was there a challenge to the warrant itself in terms of the information in the affidavit? There was some significant evidence that was being considered at the time of the sniff. They already had a report of drug possession, gun possession, drug sales from that location. So our initial position is that this court should not remove the constitutional violation and analyze the remaining facts to determine if there was probable cause. This court has done that in the past, but at least from my analysis, it does not appear there was any pushback or any argument that this court should not do that. And other circuit courts, and there's a split on this question about whether courts can do that, remove the constitutional violation to analyze the remaining facts. Our initial position is that this court should not decline to do that because it's inconsistent with Leon. But even if this court does, alternatively, we would assert that the remaining facts do not establish probable cause. The issue here is that the biggest issue I think is nothing ties the illegal conduct to this apartment. The only connection is that the confidential informant indicated that Mr. Perez lived there. But there's nothing tying any alleged drug trafficking activity or firearm use to that apartment. If there are no other immediate questions, I'll reserve the little time I have to rebuttal. Thank you. Thank you, Ms. Quigg. Ms. Searle for the government. Thank you. May it please the court, counsel, my name is Amanda Searle and I'm the prosecutor that handled this case on behalf of the United States. The district court did not err in denying Mr. Perez's motion to suppress. And it applied the appropriate standard when sentencing him under the Armed Criminal Act. The government will start by addressing the ACCA sentencing issue and would start with the standard of review of plain error. The government would note that this particular argument was not, the I.O. Flupain argument was not made in the district court below. Therefore, this court should analyze this with the standard with the plain error standard of review and look to whether it was a clear or obvious error that the district court made. The government's position is that based on McNeil versus the United States, that this court should take a backward looking approach when determining whether a prior conviction qualifies as an ACC predicate. I think it's really important in this case to note that at all times, both at the time of Mr. Perez's convictions in 2013 and at the time of his federal sentencing, there was a categorical match between the state of Iowa and the Federal Controlled Substance Act. And certainly the state of Iowa amended their act to mirror the Federal Controlled Substance Act in that regard. I think it's also important to consider the rules of statutory construction when looking at this particular issue. The ACCA is clearly concerned with prior convictions and whether I'd like to ask a question about that. And I think I think that's right that the ACCA is concerned with prior convictions. And that's what McNeil tells us, that you look and see what the conviction actually was. But isn't that different than looking at what the consequences today of having that particular prior conviction are at a federal sentencing? I think that it's important because the ACCA, the purpose behind it, of course, is to target repeat offenders. And I think that it's important. I mean, under Mr. if you would look at it and say, well, we can't now consider any cocaine conviction that occurred prior to 2015. That just seems to thwart the clear intent of Congress when looking at the ACCA, because the purpose of it is to give more enhanced sentence for repeat offenders. What about the intent of the current Congress to define what type of prior conviction would qualify to enhance the sentence? In other words, you're going to got a couple of different intents of Congress there, and it seems one of them is being overlooked in your argument. Well, I mean, I think that that is looking at the just looking at the Controlled Substance Act. It's been amended well over 160 times since its inception. And currently, I think when you just sort of step back from the legal analysis and sort of look to just how it plays out in everyday world, science is constantly evolving. A lot of our medications are derived from controlled substances. You know, oftentimes opiates also. We also drive a lot of medications from that. So as science evolves, so too will the Controlled Substance Act. And I just don't think that one can say that that Congress meant that every time that the Controlled Substance Act was amended, that we're just going to erase everybody's conviction that came before that. I mean, and certainly there are competing interests. But I think when you look at the clear purpose of the ACCA, I think that intent, the main focus of that is enhanced sentences for repeat offenders, which I don't think is properly accomplished. If you're just simply erasing people's prior convictions every time some new drug is removed from a particular schedule. Well, would you agree that it's not erasing the prior conviction? It's just not allowing it to be. It's not qualifying it as a predicate under the ACCA, which is a difference, right? That's correct. And I think, you know, looking at just like the sentencing factors, you know, unwarranted sentencing disparities, it seems to me that somebody who's selling cocaine back in 2013 should be just as dangerous as an individual who's selling cocaine in 2018. And so I guess it seems to me that it would be difficult to apply a rule of that fashion fairly across the board because it would just depend strictly on timing and luck of the draw as to what new substance may or may not have been added to a particular substance and at what time. So the government would also like to discuss, well, the government, I guess, would want to move on now to the Fourth Amendment issue. Are there any other questions in reference to the ACCA overbroad issue? Well, I guess I'll ask it bluntly showing my ignorance again. But are we the only circuit that's taking this line? I know we're contrary to Batista and the Ninth Circuit. We've said that many times. Where are the other circuits? Can you help me on that? Well, I know that there have been several circuits, the Ninth Circuit and others that have followed along with Ms. Quick's analysis. There have been other cases that have come down. The government did cite one from New Mexico where the district court in that particular case had disagreed. I was trying to ask mostly about circuits. That's hard enough for me to keep up with. Yes, Your Honor. I do think we have a little bit different line of cases on this, right? Well, and I think looking to U.S.V. I think you'd have to answer yes to that by what you've been saying. But tell me if you want to answer no or maybe. No, I think the answer is yes. And I think just looking at U.S.V. Doran that was decided in 2020 and that was an ACCA case. And basically, California had recategorized the defendant's conviction as a misdemeanor. And the court in that case looked backward and said, well, it's still an ACCA predicate because at the time he was sentenced. Is Doran R.K. one of our cases? I know we've got a line of cases like that. Yes, Your Honor. OK. Yes, Your Honor. And listen, is your argument really kind of a weird characterization? Is your argument really a realistic possibility sort of thing? Because you're saying because notice you resorted to the big thing, cocaine and not the minor little. If you ever seen it, you've seen the drug schedules. Even I've seen that. So is it really what what the main thing going on there is the main offense that even make any sense to you? What I'm trying to say? Well, certainly the government has argued in these types of cases, the realistic probability test, which certainly, you know, we have this argument a lot when the hemp versus marijuana context. But in this case, it's just so much different. This is it was a brand new drug. It was created, I think, in 2007. It's an injectable liquid used to wait for a rate when they're doing MRIs for patients to determine whether or not they have Parkinson's type tremors to try to form a good treatment plan. So certainly there is not a realistic probability that Mr. Prez's prior conviction involved. I'll flu pain because it's plain error. We don't have any record on that, right? That's correct. Proceed with your argument. At this time, I would move to the Fourth Amendment issue, and I think I would first like to start probably where I should have started in my brief, which which which is the issue of probable cause. The government would urge this court to take a look at the search warrant affidavit and look to whether there was probable cause without the dog sniff. And the government would assert that there is. And I know oftentimes the government likes to is is exceptional and likes to provide lots and lots of information in an affidavit to provide support for probable cause. But that really oftentimes is the cherry on top and certainly isn't necessarily the probable cause standard. In this particular case, as was mentioned by the appellant or in response to my question, what was there that would have connected this specific apartment to the suspected illegal conduct? So in this particular case, there was a CIA that had been determined to be reliable based on the fact that that informant had provided information in the past to law enforcement that had led to other search warrants and then the arrest of individuals based on that search warrant. That information was in the affidavit. In addition, some of the information the CIA provided was corroborated. So specifically, the CIA provided information that there was a Mr. Perez was residing in apartment 10 with his girlfriend, Miss Hare. They were able to corroborate that information through utility records. And so that is the connection that they were able to corroborate that information. The individual also stated that he was selling drugs. When they looked up his record, they did see that he had several convictions for controlled substance felonies, distribution of cocaine. And so certainly that provided further support that the information provided by the CIA was reliable. So the government would argue that standing alone that affidavit is sufficient. Moving forward to the issue of counsel, Mr. Do not need a nexus. I mean, I understand as far as you say that that you're saying it was that his CIA's information was corroborated by the prior conviction information. But what what links the drug sales that are alleged to be ongoing by this particular person to that to his home? Well, I believe and I don't have the search warrant affidavit in front of me at the moment, but I do believe that there was that the you know, the officer was aware that individuals who involved in drug trafficking often store their products in the places where they where they reside. And so that would be the nexus that the government would argue. So just general law enforcement information or experience, but nothing. You say that's enough, even though there's nothing in particular about this. This Mr. Perez. Well, the CS did provide information that he was residing at that location. I'm sorry about know about about the nexus. That there was any you only just the generalized information in your position. That's enough for probable cause. Yes. Yes. In what case do you cite for that? U.S. versus Vinton stands for the proposition that a CI may be that information from a CI might be sufficient for probable cause. If it's corroborated or if the informant has a track record for supplying reliable information. As to the issue of cartilage, I think there's a couple of competing things that for the court to consider. And I think there's this issue of cartilage. Was this area surrounding the door cartilage? And then the second question, I believe, is, was law enforcement lawfully present? If it is a protected area, were they lawfully present for the purpose that they were there for? And I think that is the distinction really between Scott and Jardines. And Scott, the court specifically notes that law enforcement was lawfully present in the location where they were when the dog sniff was done. We're in Jardines. They talk about it being an unlicensed physical intrusion. So I think when we look at it, the cartilage determination from that standpoint, if we just assume that it was cartilage, I think we can say, well, they were lawfully present. And they weren't just lawfully present. They were lawfully present for that particular purpose. And I know that Mr. President difference between, though, I mean, is that is that is is that sort of conflating the difference between or confusing the difference between the general hallway and what the defendant is saying is the particular current cartilage around the door. In other words, you could be there lawfully in the hallway, the general hallway. But if you sort of skipped over the question, which is the tough one, whether that's cartilage right outside someone's individual doorway. Well, I mean, I think that I think there's a couple of ways to look at it. And I think that in the context of a common hallway, property law is pretty clear that the common hallway is the landlord's responsibility as far as taking care of it. And the landlord or the property owner shares access to that common area. So I think it's much different in a situation where you have a door in a common hallway because you do have property rights attached to that common hallway, which I think extend to that. Can I interrupt you since you don't have much time? So I just want to make sure I understand your position that the that the two or three inches outside Mr. Paris's door. Is it your position that that's part of the hallway and could never be cartilage? I think that that is a case by case assessment using the done factors. And I think that it always needs to be that way because every structure is different. And I think that in this particular case, if there was an enclosure around his door and that that area was was private to him, I think our analysis would be much different if the common hallway was on the other side of this privacy location. But we don't have those facts here. So I would say that not that it's not that it's not a no always or never situation, but it's certainly just looking at the done factors for every case. And I think with that, I will waive the rest of my time. All right. Thank you, Mr. Quick. I think we pretty much used up all your time, but we'll give you a full minute to respond. And in light of our questions, please respond to what you've heard from the government. So starting with the nexus issue, I want to point to the court, to the court of the case that we cited in our briefs for the notion that not assuming that there's information that an individual is involved in drug trafficking, there's always going to be drugs at their residence. And this also might be splitting hairs, but there was not corroboration necessarily that Mr. Perez lived there by the by the information. There was corroboration that his girlfriend lived there and the CIA had said that he was living with his girlfriend. As far as the argument on the sentencing, the government's complaint seems to be more dealing with the categorical approach than with actual timing, because this concern of erasing all cocaine convictions. That's not necessarily the argument we're saying, not saying no cocaine conviction will ever qualify. We're saying Mr. Perez's conviction doesn't qualify because of the divisibility analysis and that it included ioclopane. And so any cocaine conviction that included that substance was over is overbroad and no longer qualifies. And as far as the government's arguments, well, it's unlikely that there's no realistic probability just because of the type of substance, just like defense attorneys don't get to rely on hypotheticals or anything like that. The government doesn't get to as well here. And here we have plain language from both the federal and state government that ioclopane was a part of this definition of cocaine and no longer is. So for those reasons, we'd ask this court reverse. Thank you. Thank you, Ms. Quick. Court appreciates both counsel's argument to the court this morning on a case that will take some study. We appreciate the assistance of counsel in our examination. Counsel may be excused. Thank you.